IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

United States of America

    v.                        Case No. 2:08-cr-81-5

Ronald Kelsor

OPINION AND ORDER

This matter is before the court on the defendant's motion to suppress the wiretap evidence in the above case. Defendant argues that the wiretap application failed to comply with the necessity requirements of 18 U.S.C. §2518(1)(c).

I. Applicable Legal Standards

Section 2518(1)(c) requires that the wiretap application include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" §2518(1)(c). Further, the wiretap provisions permit a judge to enter a wiretap order only if the judge determines that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" 18 U.S.C. §2518(3)(c). Only the evidence presented within the four corners of the wiretap application can be used to evaluate necessity. United States v. Gonzalez, Inc., 412 F.3d 1102, 1112 (9th Cir. 2005); 18 U.S.C. §2518(3) (wiretap order may issue if the judge determines necessity "on the basis of the facts submitted by the applicant").[1]

The purpose of the necessity requirement is "to ensure that a

---

[1] Defendants have not alleged or offered proof that the affiant knowingly or recklessly made false factual statements in the affidavit relevant to the issue of necessity so as to require an evidentiary hearing under Franks v. Delaware, 438 U.S. 154 (1978).

wiretap 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" United States v. Alfano, 838 F.2d 158, 163 (6th Cir. 1988)(quoting United States v. Kahn, 415 U.S. 143, 153 n. 12 (1974)). The necessity requirement also protects against the impermissible use of a wiretap as the "initial step in [a] criminal investigation." United States v. Giordano, 416 U.S. 505, 515 (1974).

The necessity showing under §2518(1)(c) must be tested "in a practical and common sense fashion." United States v. Landmesser, 553 F.2d 17, 20 (6th Cir. 1977)(quoting S.Rep. No. 1097, 1968 U.S.Code Cong. & Ad.News, p. 2190). "What is required ... is information about particular facts of the case at hand which would indicate that wiretaps are not being 'routinely employed as the initial step in criminal investigation.'" Id. (quoting Giordano, 416 U.S. at 515). The entire wiretap application may be considered in determining whether the necessity requirement has been met. Id. at 20-21. Although a purely conclusory affidavit unrelated to the investigation at hand is not sufficient, the prior experience of investigative officers is relevant in determining whether other investigative procedures are unlikely to succeed if tried. United States v. Rice, 478 F.3d 704, 710 (6th Cir. 2007).

The purpose of the necessity requirement "'is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'" Landmesser, 553 F.2d at 20 (quoting United States v. Pacheco, 489 F.2d 554, 565 (5th Cir. 1974)). Thus, "the government is not required to prove that every other

conceivable method has been tried and failed or that all avenues of investigation have been exhausted." Alfano, 838 F.2d at 163; see also Rice, 478 F.3d at 710. The government "need not prove the impossibility of other means of obtaining information." United States v. Stewart, 306 F.3d 295, 305 (6th Cir. 2002); see also Landmesser, 553 F.2d at 20 (a wiretap need not be used only as a last resort). Instead, "[a]ll that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." Alfano, 838 F.2d at 163-64 (internal quotation marks omitted); see also United States v. Lambert, 771 F.2d 83, 91 (6th Cir. 1985).

For example, in Alfano, the court upheld the wiretap where the government revealed the steps that had been taken in regard to other investigative targets and the difficulties in placing an informant in or maintaining continual surveillance of those involved in far-flung operations, including involvement of a number of members of a close-knit family group. Alfano, 838 F.2d at 164. In Lambert, the court held that the necessity requirement was satisfied where the affidavits explained in detail that other investigative measures could not reasonably be used because of the defendant's extreme and correct suspicion that his activities were being monitored, and the fact that alternative investigative procedures, such as directly questioning defendant and his associates, would likely alert the suspects to the presence and scope of the investigation. Lambert, 771 F.2d at 91. In United

3

States v. Woods, 544 F.2d 242, 257 (6th Cir. 1977), the defendants argued that the necessity element was not met because the government refused an informant's offer to attempt to infiltrate the drug conspiracy.  The court upheld the district court's rejection of this argument, noting that the informant would have had difficulty in learning all of the details of and participants in the widespread organization, and that the government would have had great difficulty in establishing criminal liability by the informant's testimony alone in light of his lengthy criminal record.  Id.

In United States v. Giacalone, 853 F.2d 470, 480 (6th Cir. 1988), the court rejected defendants' argument that the government should have asked victims of an extortion scheme to wear a wire to record the threats of defendants, where the agent stated that this approach was considered and rejected because it would "'alert the suspects to this pending investigation and would thereby cause them to alter their modus operandi thereby frustrating the investigation.'"  The court held that the necessity requirement was satisfied where the agent stated in his affidavit that informants had refused to testify for fear of reprisal, that attempts to infiltrate defendants' organization had been unsuccessful in the past and were unlikely to succeed in the future, and that undercover investigations would be extremely dangerous.  Id.

Likewise, "the mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." Stewart, 306 F.3d at 305.  For example, in United States v. Cooper, 868 F.2d 1505, 1508-09 (6th Cir. 1989), the Sixth Circuit held that

4

the use of other means of investigation, including controlled purchases, consensual telephone monitoring and physical surveillance, served to establish that "normal investigative procedures" had been extensively conducted and that the requested interception of wire and oral communications was not "employed as the initial step in criminal investigation." See also United States v. Cooney, 26 Fed.App'x 513, 522 (6th Cir. Jan. 22, 2002)(wiretap upheld where evidence showed that normal techniques used in the investigation were insufficient to expose the extent of the conspiracy).

The Sixth Circuit has recognized that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." Landmesser, 553 F.2d at 20; see also Stewart, 306 F.3d at 307 (upholding wiretap where various members of drug conspiracy facilitated the criminal enterprise through multiple telephone conversations from several locations). In United States v. Washington, 112 Fed.App'x 501, 504 (6th Cir. Oct. 20, 2004), the court rejected the defendant's argument that the wiretap was unnecessary because government had already obtained evidence through use of cooperating individuals and physical surveillance. The court concurred in the district court's conclusion that electronic surveillance of defendant's cellular phone, the virtual "nerve center" of the drug conspiracy, was necessary to establish the full scope of the criminal enterprise, noting that the "problem faced by law enforcement in this matter involved a wide-spread, interstate conspiracy that relied primarily upon cellular communications for operational planning and execution." Id.; see

also <u>Stewart</u>, 306 F.3d at 307 (upholding wiretap where information revealed that the government could not have uncovered the full scope of the conspiracy, especially not in a relatively safe manner, without the wiretaps).

## II. The Wiretap Applications

Three wiretap applications were filed in the instant case. The first application was approved on February 6, 2008. Two subsequent applications were approved on March 7, 2008, and April 3, 2008. These applications set forth in considerable detail the facts and circumstances surrounding the investigation of the drug conspiracy alleged in this case. The court has reviewed the affidavits in their entirety. Due to their length, the court will simply note the most relevant facts in this order.

## A. First Wiretap Application

The application filed on February 6, 2008, sought a wiretap of a cellular phone subscribed to by defendant ("target phone #1"). In the application, the affiant, Drug Enforcement Administration Special Agent LeAnn Bakr, stated that agents began an investigation in May of 2007 into reports that Audrey Beheler and Anthony Lacorte were purchasing heroin from defendant, and that defendant used a telephone to facilitate his distribution activities. The affiant stated that various investigative techniques were employed, including using a confidential informant, referred to as CS1, to make controlled purchases of heroin from Audrey Beheler and Anthony Lacorte; interviewing Beheler's sister, who turned over heroin and marijuana she had found in Beheler's apartment; an unsuccessful attempt by the informant to purchase heroin at a residence on Kossuth Street which was linked to defendant; and physical

6

surveillance of the Kossuth Street residence, during which officers observed vehicles which were determined from Bureau of Motor Vehicle records to be registered to persons with prior drug convictions. Agents obtained phone records for defendant's phone, which indicated that 18,966 calls were linked to defendant's phone during the three-month period from March 19, 2007, through June 19, 2007.

The affidavit further disclosed that agents conducted surveillance of Beheler's activities, and observed her meet with defendant at a location away from the Kossuth Street residence. Anthony Lacorte was arrested on August 21, 2007, and identified a man named Ronald as the person who supplied heroin to himself and Beheler. Through surveillance, automobile and phone toll records, and traffic stops, the agents also identified Mitchell Wood and Billy Lee as being individuals possibly involved in defendant's drug distribution activities. On October 26, 2007, agents conducted a traffic stop of Victor Woodson, defendant's nephew, and observed a bundle of currency and a packet with suspected heroin residue in the vehicle. During their surveillance activities, agents observed defendant exit a residence located on South Hamilton Road.

After observing a suspected drug transaction involving Billy Lee and an unknown female on November 16, 2007, officers executed a traffic stop and arrested the female, who had eighteen bundles of heroin in her possession. The female, referred to as CS2, agreed to cooperate in the investigation. She told agents that defendant, Billy Lee, and Victor Woodson supplied her with heroin, and that defendant used target phone #1 in his drug business. She did not

know who supplied defendant with heroin. CS2 participated in controlled purchases of heroin from defendant and Victor Woodson, but was unsuccessful in her attempts to introduce an undercover officer to them.

On January 11, 2008, Justin Knisley was arrested during a traffic stop when he was found to be in possession of heroin. He told agents that he obtained his heroin from the defendant, and that the defendant used target phone #1 to arrange drug transactions. Mitchell Wood was arrested during a traffic stop on January 19, 2008, and stated that he obtained heroin from defendant for distribution in the Nelsonville, Ohio, area.

In November of 2007, the agents secured an order authorizing a pen register and trap and trace device for defendant's phone. The pen register and trap and trace device revealed 2895 phone calls to or from Victor Woodson and target phone #1 from March 19, 2007, to January 13, 2008; 901 calls between defendant and Mitchell Wood from August 4, 2007, to January 20, 2008; 1,505 calls between defendant and Billy Lee from May 20, 2007, to December 10, 2007; 439 calls between a phone registered to the sister of Audrey Beheler and defendant from April 12, 2007, to December 10, 2007; and 389 calls between Justin Knisley and defendant between October 15, 2007, and January 28, 1008.

In the section of the affidavit relating to need for the wiretap, the affiant stated that agents had been unable to identify some members of the conspiracy because their phones were registered under false names, or were pre-paid cellular phones which did not require a subscriber's name. The affiant also stated that agents had been unable to identify defendant's source of supply and the

8

location of his stash houses. The affiant indicated that other methods of investigation had been used, including physical surveillance, telephone records and confidential informants, but that these methods had not revealed the nature and scope of the drug business, the identity of all conspirators, the location(s) where controlled substances, records and money were stored, or the dates and times of all deliveries of controlled substances.

In regard to the use of confidential informants, the affiant stated, based on her experience, that it would be impossible for undercover agents or confidential informants to infiltrate defendant's organization and to learn the entire scope of the conspiracy. She stated that it was unlikely that an undercover agent could infiltrate the organization to any great extent, and that to attempt this would place the undercover agent in danger. She stated that CS1 knew only Beheler and Lacorte, and that since CS1 was not currently engaged in drug activities, any information she could provide is stale. Affiant indicated that although CS2 was able to make controlled purchases from Woodson and defendant, Woodson and defendant would not permit her to introduce an undercover agent to them or to bring the agent to the drug transaction, stating that they did not want to meet new people. Additionally, CS2 did not know the source of defendant's supply, and affiant believed that it would be out of character for CS2 to start purchasing large quantities of heroin or to talk with defendant about his source of supply. Affiant further stated that the credibility of these informants would be subject to attack at trial due to their drug use and their motives for assisting the agents.

9

Affiant further stated that agents considered using individuals such as Lacorte, Wood, and Knisley, but that it would be difficult to use them in an undercover capacity because of their addiction to heroin and their continuing criminal conduct and arrests. Affiant further indicates that these individuals were unaware of defendant's source of supply, and would not be able to identify defendant's source.

In regard to grand jury subpoenas, affiant stated that, in her experience, issuing grand jury subpoenas would not achieve the goals of the investigation because any conspirators or other participants would be likely to either not appear or would invoke their right against self-incrimination. She further stated that issuance of such subpoenas would alert the conspirators to the investigation and possibly result in the destruction of evidence or harm to the agents or confidential informants. Affiant noted that Audrey Beheler invoked her constitutional right not to cooperate when she was arrested on August 21, 2007, and March 16, 2007.

Affiant also discussed the use of search warrants and trash pulls as investigative tools. Affiant stated that because the agents had no evidence that the Kossuth Street and South Hamilton Road residences were being used to store drugs, they did not have sufficient evidence to establish probable cause to search these residences. The affidavit indicated that the Kossuth Street address is not titled in defendant's name. Affiant further stated that even if warrants could be obtained, the execution of a search warrant at a single location would likely cause the conspirators to temporarily close operations or to change their methods of operation. Affiant further stated that there is a community trash

10

dumpster near the Kossuth Street residence, and therefore it would be difficult to determine the source of the trash.  In addition, during their surveillance, agents never observed trash being carried out of the Kossuth Street residence.  Affiant further stated that although trash had been observed outside the Hamilton Road residence, collection could potentially compromise the investigation due to the distance of the trash from the house, lack of information regarding the surrounding neighbors, and the fact that a trash collection agency had never been used previously by the affiant.

In regard to interviews with co-conspirators, affiant stated that such interviews would not be likely to produce information concerning the full scope of the conspiracy, including the source of defendant's supply, and would alert the members of the conspiracy to the investigation, possibly resulting in the concealment or destruction of evidence.  Affiant stated that such individuals would be reluctant to incriminate themselves, and that they were likely to flee the jurisdiction.  Specifically, affiant noted that Audrey Beheler had declined on two occasions to speak with the agents, that Victor Woodson was unlikely to cooperate against defendant, his uncle, and that Billy Lee appeared to be a close associate of defendant and was unlikely to cooperate.

The affidavit revealed that agents did utilize phone records, a pen register, and a trap and trace device in attempting to identify co-conspirators.  Affiant noted that while some participants were identified, others could not be because the phones were subscribed to under false names or were prepaid phones. She further stated that these methods were of limited value,

because they revealed the telephone numbers associated with the calls, but not the nature or content of the calls.

The affidavit also revealed that physical surveillance was conducted during the investigation on numerous occasions. However, affiant stated that such surveillance does not reveal the purpose of the meetings and other activities of conspirators, whereas such surveillance combined with wire interception would do so. Affiant stated that surveillance during controlled buys allowed agents to corroborate the information provided by informants, but did not lead to disclosure of information such as the identity of all conspirators, possible stash locations, and defendant's source of supply. While surveillance disclosed that persons with drug convictions visited the Kossuth Street address, this surveillance alone was insufficient to establish the purpose of their visits. Affiant further stated that Billy Lee and Victor Woodson have acted in a manner which suggests that they are vigilant about the possibility of surveillance. Lee had left the Kossuth Street address and driven through alleys prior to returning to the address, and Woodson exited his vehicle on one occasion, looked in the direction of the surveillance vehicle, and yelled something at the agent.

B. Second Wiretap Application

The second wiretap application dated March 7, 2008, incorporated by reference the previous affidavit. In the second wiretap application, agents sought to extend the wiretap on defendant's phone, and to commence wiretaps on two additional phones, one of them registered to David McReynolds ("target phone #3"), and the other registered under the name "John Gotti" but used

12

by McReynolds ("target phone #2"). The affidavit described intercepted phone conversations to or from defendant's phone, as well as the physical surveillance of meetings between conspirators which was accomplished as a result of information obtained from the wiretap. The affidavit further indicated that from intercepted conversations, agents were able to identify McReynolds and Edmond Plunk as sources of supply for defendant, and were also able to identify other co-conspirators. Affiant Bakr stated that agents obtained telephone toll records, and also secured the issuance of orders authorizing a pen register and trap and trace device on target phone #2 on February 15, 2008, and on target phone #3 on February 22, 2008. These phone records and devices revealed numerous phone calls between McReynolds, Plunk, defendant, and other conspirators.

In the section relating to the need for the wiretaps, affiant stated that the methods of investigation, including surveillance and telephone records, had not enabled agents to identify McReynolds' and Plunk's sources of supply, the identity of every member of the conspiracy, the stash houses used by the conspirators, or the sources of financing.

In regard to the use of undercover agents and informants, affiant stated that based on her experience and the information gained in the investigation, the persons involved in the conspiracy were trusted friends and associates, and an undercover agent would not be able to infiltrate the organization to any great extent. In addition to the previous comments about the informants, affiant stated that agents had reason to believe that CS2 continued to purchase heroin from defendant, and that it was often difficult to

13

monitor or control an addicted individual or an individual who continues to engage in criminal activity as an informant. Affiant further stated that it was unlikely that CS1, CS2 or any of the other conspirators such as Lacorte, Wood, Knisley, Andrea Herdman and Mark Dowdy, who had contact with the police during the investigation, would be able to learn information concerning the source of supply or the identity of other participants even if they agreed to cooperate. She noted that Dowdy attempted to flee from the police after obtaining heroin from defendant. Affiant also contacted other drug task forces in the area. She learned that none of these agencies were currently investigating the individuals involved in the instant conspiracy, and therefore these agencies were unable to provide undercover officers or informants with the present ability to make contact with these conspirators.

In regard to grand jury subpoenas, the affiant indicated that subpoenas would not be successful in the investigation, since the coconspirators would likely invoke their right to remain silent, and the use of immunity to obtain their testimony could prevent the prosecution of more culpable participants. She stated that Michael Shipley, a suspect identified during the investigation, would not be likely to respond favorably to a grand jury subpoena since he was not willing to respond to the officer's questions in regard to the person he was meeting at a restaurant while he was under surveillance. Affiant further stated that many of the individuals identified through the intercepted phone conversations were drug users who might fear prosecution if approached, and were not likely to have significant information about the conspiracy.

In regard to search warrants, affiant stated that the

14

investigation had not revealed sufficient evidence that drugs were stored at Franklin Avenue and Kingsrowe Court residences frequented by McReynolds so as to establish probable cause to search those residences.  She further noted that suspected narcotics activity was observed only on one occasion at the South Hamilton Road residence frequented by defendant and the Mariner Drive address connected with one of defendant's contacts named Keisha.  Affiant stated that due to the heavy amount of pedestrian and vehicle traffic around the residences, and the fact that the residences on Kossuth, Franklin Avenue and Kingsrowe Court were not in the name of defendant or McReynolds, any evidence found at those locations could be attributed to others.  She further noted that most of the suspected narcotics transactions observed during the investigation did not occur at any of these residences.

In regard to trash pulls, affiant stated that on February 23, 2008, agents observed a male carry two bags of trash out of the Franklin Avenue residence and place them in a community dumpster, but when agents later attempted to retrieve the trash from the dumpster, the trash bags were no longer there.  On February 24, 2008, agents observed that there were no trash cans on the curb for the Franklin Avenue residence.

In regard to using interviews of conspirators and accomplices, affiant noted that it was unlikely that any of the targets under investigation would be willing to cooperate.  In addition to mentioning the persons discussed in the first application, she noted that Shipley was even unwilling to provide information about the person with whom he was meeting at a restaurant.  Affiant further reported that Edmund Plunk, when interviewed during a

traffic stop on March 1, 2008, concerning money seized from his vehicle, gave false and conflicting statements, and was therefore unlikely to cooperate.

Affiant stated that the phone records reviewed during the investigation had not enabled agents to identify all of the members of the conspiracy, nor had agents been able to determine the phone numbers for all of the individuals who were observed meeting with defendant, McReynolds, and others. She stated that on February 22, 2008, she obtained a mobile tracking device for McReynolds' Ford Explorer. However, she expected to receive limited information from this device because McReynolds also drives other vehicles and frequents other residences which are also visited by other individuals. In addition, affiant stated that McReynolds appeared to be conscious of surveillance when operating the vehicle, the device does not always provide a precise location for the vehicle, and the device is powered by a battery which can run out.

In regard to physical surveillance, affiant stated that the surveillance which had been conducted in the case had not led to full disclosure of all conspirators, stash locations, or the identity of all sources of supply. She stated that the driving patterns of Billy Lee, Victor Woodson and McReynolds are consistent with individuals who believe they are being watched by law enforcement or who are trying to determine if they are being watched, thus hindering the ability of the agents to monitor their activities without compromising the investigation. Affiant noted that during one intercepted call, defendant stated that individuals needed to be careful while driving in order to avoid detection by law enforcement. On February 16, 2008, agents observed McReynolds

16

look around in the vicinity of his Ford Explorer.  On another
occasion, agents attempted to follow a vehicle departing from the
Franklin Avenue residence, and were not able to maintain
surveillance since the van traveled through alleys, thereby making
any pursuit more obvious.

Affiant reported that it was becoming increasingly difficult
to keep the Kossuth Street residence under surveillance because
some of the individuals seen at the residence also live in the area
and may be aware of new vehicles appearing in the neighborhood,
thereby creating the risk of alerting the conspirators to the
presence of the officers.  On one occasion, a pedestrian approached
an agent near the residence and asked him why he was there, then
loudly began to shout that a Caucasian male was in the area.

C. Third Wiretap Application

The third wiretap application dated April 3, 2008, sought an
extension of the wiretap on target phone #3, subscribed by
McReynolds, and another phone ("target phone #4"), subscribed in
the name "Karl Smith" but used by Edmond Plunk.  The agents did not
request an extension of the wiretap on defendant's phone.  The
affidavit incorporated the previous affidavits, and included
excerpts of communications intercepted with the preceding wiretaps,
and information obtained through physical surveillance of the
conspirators' activities and analysis of phone records.  The
affidavit also included evidence obtained from pen registers and
trap and trace devices authorized on February 22, March 28, and
March 31, 2008.

Under the section addressing the need for the wiretap, affiant
stated that the agents had not been able to identify all members of

17

the conspiracy, particularly since the participants in the recorded conversations frequently did not identify themselves and talked in vague terms or in code. Affiant further stated that the agents had not been able to identify all sources of supply for heroin, the location of stash houses, or the source of funds. Affiant reiterated her previous reasons as to why the use of undercover agents and informants was not likely to be successful. She noted that when officers approached Kristine Dixon about her heroin activities, she claimed to be working for law enforcement in the investigation of Mitchell Wood, even though no law enforcement officer had ever notified the investigating agents about this alleged cooperation. Affiant stated that the agents decided not to approach Eric Hood and Samantha Black about cooperating because they had convictions for crimes relating to dishonesty or obstruction of justice. Affiant also concluded that it was premature to approach McReynolds or Plunk about their sources of supply because the intercepted conversations to date had failed to provide any definitive information concerning their sources of supply and where the heroin is maintained.

Affiant reiterated her previous statements concerning the futility of using grand jury subpoenas to gather evidence. Affiant further noted that it would be difficult to convince McReynolds to cooperate because he spoke in code in the majority of his telephone calls, and thus those calls were not definitive proof of his participation in illegal activity or were subject to different interpretations (in other words, that it would be difficult to convince him that the agents had any evidence against him which would be sufficient to convict).

18

In regard to search warrants, affiant stated that the agents did not have sufficient evidence to establish probable cause to search the Franklin Avenue and Kingsrowe court residences frequented by McReynolds, the Cedar Run Drive residence connected with Edmond Plunk, or the Briston Drive residence connected with Mandel Cantrell, because no conversations had been recorded in which the participants discussed the presence of drugs at any of those locations or the delivery of drugs to those locations at a particular time. Affiant stated that an attempt was made to conduct a trash analysis at the Cedar Run Drive residence, but that no trash was observed on the curb at that residence on the regularly scheduled trash collection days.

Affiant repeated her earlier statements as to why she believed that interviews with conspirators would not be productive. In addition, she noted that Mandel Cantrell was observed at the Briston Drive address, but listed another residence as his address on the rental contract for the Ford Edge he drives. She concluded that Cantrell was thus likely to conceal his narcotics activities if confronted by law enforcement.

Affiant reiterated that agents had been unable to identify all members of the conspiracy or their phone numbers through phone records. She noted that Plunk uses different telephones and changes phone numbers, and that some telephone numbers in contact with his phone are prepaid telephones with limited subscriber information.

Affiant again stated that physical surveillance was of limited value because it would not reveal the purpose of meetings, and because many of the participants were alert to surveillance. She

19

noted that on two occasions, agents had difficulty following Mandel Cantrell due to the manner of his driving, and that agents also had difficulty following McReynolds on March 19, 2008, due to the manner in which he operated different vehicles.

III. Analysis

The affidavits contain detailed statements describing the investigative techniques which were actually used in the investigation, as well as the reasons for the affiant's belief that other methods which were not used would be unlikely to succeed or would be too dangerous based upon the facts and circumstances of this particular investigation.

Nonetheless, defendant argues that the affiant's statements concerning approaching conspirators about cooperating in the investigation and the use of grand jury subpoenas are inadequate to show why these methods of investigation would not be likely to succeed. The affiant's conclusion that Victor Woodson would probably not provide information against defendant, his uncle, is not unreasonable. See Alfano, 838 F.2d at 164 (finding of necessity supported in part by fact that conspirators included members of a close-knit family group). Likewise, the activities of the conspirators reported in the affidavit indicate that Billy Lee was a close associate of the defendant in the narcotics operation, thus supporting the conclusion that he would not be likely to cooperate. In light of the fact that Audrey Beheler had refused on two occasions to discuss her narcotics activities with law enforcement, the agents had no reason to believe that she would cooperate if they approached her again. In any event, the agents were not required to attempt every conceivable method of

20

investigation, "but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." Landmesser, 553 F.2d at 20. The affiant adequately explained why the agents chose not to approach Beheler about cooperating.

In regard to the issuance of grand jury subpoenas, the affidavits indicated that many of the participants in the conspiracy, including Plunk, McReynolds, Shipley, and Cantrell, engaged in conduct designed to conceal their involvement in the conspiracy, including giving false information to officers, registering phones under false names, giving a different address on a lease agreement, and refusing to provide information to officers. Such conduct makes it unlikely that these individuals would confess to their involvement in illegal activity. The prior experience of the agent is also relevant in determining whether an investigative measure is likely to fail. Rice, 478 F.3d at 710. It was not unreasonable for the affiant to conclude, based upon her experience and the information learned during this investigation, that the known participants in the conspiracy, if served with grand jury subpoenas, would refuse to testify, or that serving them with subpoenas would alert the other members of the conspiracy that an investigation was pending, thereby creating the risk of evidence being destroyed or suspects absconding. See Lambert, 771 F.2d at 91 (necessity shown where alternative methods, such as questioning defendant and his associates, would likely alert suspects to the presence and scope of the investigation).

Defendant also takes issue with the affiant's statement that trash was not collected from the Hamilton Road residence because collection could potentially compromise the investigation due to

the distance of the trash from the house, lack of information regarding the surrounding neighbors, and the fact that a trash collection agency had never been used previously by the affiant. Defendant argues that the fact that the affiant had never utilized a trash collection agency should not excuse the failure to attempt a seizure of the trash.  It is unclear what the affiant meant by this statement.  It could mean that she was reluctant to use an investigative technique with which she was unfamiliar, or that she did not want to use a trash collection agency which was new to the neighborhood and which could therefore attract attention and arouse suspicions, both valid reasons.  Even if this statement is disregarded, the other reasons given for not seizing the trash, including the distance of the trash from the house (which might result in the seizure being observed) and the lack of information about neighbors who might also have access to the trash bag (thus jeopardizing the value of any evidence collected) or who might report the trash-gathering activities to the conspirators, are adequate.

Defendant also argues that the agents had ample evidence prior to the wiretap application which could have formed the basis for drug charges against him, including controlled purchases made by a confidential informant.  The fact that other investigative techniques were successful in generating evidence against a defendant does not preclude the issuance of a wiretap.  Stewart, 306 F.3d at 305; see also Washington, 112 Fed.App'x at 504 (rejecting defendant's argument that wiretap was unnecessary because the government had already obtained evidence through other means, and noting that the use of cellular phones was an integral

part of the drug conspiracy).  The agents were not required to conclude the investigation after collecting some evidence against defendant when it appeared likely from the evidence they had gathered that defendant was a participant in a much larger conspiracy.  They lacked information concerning defendant's source of heroin and the identity of other participants in the conspiracy. Since the evidence the agents had obtained indicated that the defendant extensively utilized his cellular phone in conducting his drug business, the wiretap application was warranted.  See Landmesser, 553 F.2d at 20 (recognizing that "wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation").  The affidavit sufficiently describes why the investigative techniques actually used by the agents were not adequate to reveal the whole scope of the conspiracy and all of its participants.  See Cooney, 26 Fed.App'x at 522 (upholding wiretap where the magistrate judge found that normal techniques of investigation were insufficient to expose the extent of the conspiracy and all of its participants).

The court finds that the wiretap affidavits comply with the statutory requirement of providing to the court "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" §2518(1)(c).  This is not a case where the agent provided only general or conclusory statements in the affidavit.  The affidavits here provided detailed information about particular facts in the specific context of the investigation in this case.  The affidavits reveal that the wiretaps were not being used as the initial step in

23

the criminal investigation, but rather that the wiretaps were only sought after other methods of investigation undertaken over a period of nine months, including controlled purchases by confidential informants, physical surveillance, examination of phone toll records, pen registers, and trap and trace devices, were used, but were unsuccessful in revealing the nature and scope of the conspiracy, the source of defendant's supply of heroin, and the identity of the conspirators.   The affiant also gave adequate reasons as to why other investigative methods were not tried because they were unlikely to succeed if tried or would be too dangerous.  The conclusion of the issuing judge in authorizing the three wiretaps that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous" is amply supported by the information provided in the affidavits.

IV. Conclusion

In accordance with the foregoing, the court concludes that the wiretap applications in the instant case satisfied the requirements of 18 U.S.C. §2518(1)(c), and defendant's motion to suppress the wiretap evidence is denied.


Date: August 4, 2008            _____s\James L. Graham_____
                                James L. Graham
                                United States District Judge




24